SOTOMAYOR, Circuit Judge.
Universal Oil, Ltd (“Universal”), Liberian International Ship & Corporate Registry (“LISC”), and Praxis Energy Agents S.A. (“Praxis”) (collectively, “lienors”) appeal from judgments of the United States District Court for the Southern District of New York (Patterson, J.), upholding grants of summary judgment by the Bankruptcy Court for the Southern District of New York (Blackshear, B.J.) in favor of the moving defendants-appellees Allfirst Bank (“Allfirst”) and Wayland Investment Funds, LLC (“Wayland”) (collectively “defendants”). See In re Millenium Seacarriers, Inc., 2004 WL 63501 (S.D.N.Y. Jan.14, 2004) (“Universal I ”); In re Millenium Seacarriers, Inc., 2003 WL 22939112 (S.D.N.Y. Dec. 11, 2003) (“Praxis I ”).
This case presents a putative clash between bankruptcy law and admiralty law. We must clarify the scope of a bankruptcy judge’s jurisdiction to administer a debt- or’s maritime assets under 28 U.S.C. §§ 1334(e) and 157. We hold that the *86 congressional grant of subject matter jurisdiction to the district courts to adjudicate in bankruptcy “all ... property, wherever located,” 28 U.S.C. §§ 1334(e), extends to vessels that have not been arrested within the court’s jurisdiction, and because the lienors litigated their lien claims before the bankruptcy court, the bankruptcy court had equitable jurisdiction to extinguish the lienors’ maritime liens.
BACKGROUND
In 1998, Millennium Seacarriers was formed to hold the capital stock of various vessel-owning subsidiaries (collectively “Millenium” or “debtors”). Millenium raised capital by issuing notes with the aggregate principal amount of one hundred million dollars at maturity. These initial notes were later exchanged for certain first priority ship mortgage notes guaranteed by each of Millenium’s vessel-owning subsidiaries (the “Notes”), as provided for in a July 15, 1998 Indenture, in favor of appellee Allfirst as indenture trustee. The Notes were subsequently registered with the Securities and Exchange Commission (SEC). Between March 1999 and November 2001, appellee Wayland purchased a substantial number of the Notes in the secondary market, and became the beneficial owner of approximately eighty-five percent of the Notes.
1. The Bankruptcy Court Proceedings
Millenium filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, as amended, with the Bankruptcy Court for the Southern District of New York (Blackshear, B.J.) on January 15, 2002. On January 28, 2002, appellee Wayland filed a motion to lift the automatic stay of civil actions by creditors, or in the alternative, to convert the cases into petitions for liquidation under Chapter 7 of the Bankruptcy Code, or, in the alternative, to appoint a Chapter 11 trustee. Millenium filed an objection to Wayland’s motion and the bankruptcy court held a hearing on February 13, 2002. At that hearing, Wayland and Millenium reached an agreement “so ordered” by Bankruptcy Judge Cornelius Blackshear. Pursuant to that agreement, Millenium filed an amended motion on February 28, 2002 (the “Sale Motion”), pursuant to Section 363 of the Bankruptcy Code, 11 U.S.C. § 363, to (a) sell substantially by mortgage credit bid all of Millenium’s assets free and clear of liens, claims and interests; and (b) assume and assign contracts and leases in connection with such sale. The bankruptcy court accepted the Sale Motion the same day, and established bidding, notice and objection procedures pursuant to which all objections to the Sale Motion were due by March 22, 2002. Lienors LISCR and Universal, represented by the same counsel, filed maritime lien claims and objections to the sale order on March 21, 2002, and on March 22, 2002, lienor Praxis, separately represented, did as well.[1]
LISCR’s notice of objection stated a claim for maritime liens under the Ship Mortgage Act, 46 U.S.C. §§ 31321-31330, arising from unpaid Liberian tonnage taxes. Universal’s notice of objection stated claims for maritime liens under the same act, arising from deliveries of bunkers (tanks) of oil that took place in Panama in 2001 and 2002 and were never paid for. The substance of both LISCR’s and Universal’s notices of objection was that the bankruptcy court’s authority to sell the vessels “free and clear” pursuant to 11 U.S.C. § 363(f) did not extend to vessels over which the district court lacked in rem jurisdiction, because only an admiral *87 ty court acting in rem pursuant to 46 U.S.C. § 31326 and traditional tenets of admiralty law could deliver a vessel free and clear of its maritime liens. Praxis’ notice of objection stated maritime lien claims for tortious conversion and fraudulent inducement arising from unpaid marine fuel deliveries to those vessels. The substance of Praxis’ objection was not jurisdictional, but was instead based on 11 U.S.C. § 363(f), which sets conditions for when debtors may sell their property free and clear of any lien. Praxis argued that the proposed sale did not meet the requirements of § 363(f) because, inter alia, substantive admiralty law did not recognize the superiority of foreign preferred ship mortgage liens over Praxis’ maritime tort liens and because Praxis did not consent to the sale.

a. The March 27, 2002 Sale Hearing & Order

On March 27, 2002, Judge Blackshear held a hearing on the Sale Motion. Universal and LISCR argued that the bankruptcy court lacked in rem jurisdiction over the vessels because none of the vessels had been arrested within the district court’s jurisdiction; indeed, some of the vessels were arrested in foreign ports. Counsel relied upon the decision of the Southern District of New York in In re Millenium Sea Carriers, Inc., 275 B.R. 690 (S.D.N.Y.2002) (Haight, J.) (“Milleni-um ”), decided one day prior to the hearing, to support its contention that the bankruptcy court could not conduct a valid judicial auction expunging the liens on the vessels.
Millenium involved another lienor, Omni, who contested the validity of the same Sale Motion involved in the instant case. Omni sought relief from the district court in the form of mandatory withdrawal of the reference of the case to bankruptcy court, in order to enable Omni to arrest the specific Millenium vessel in admiralty and to compel Millenium to submit to arbitration for certain wage liens. 275 B.R. at 692-93. The district court held that because it lacked in rem jurisdiction over the vessel, it could not grant this relief. Id. at 698-99. The court also surveyed several district court decisions considering the interplay between bankruptcy and admiralty jurisdiction, as well as circuit cases discussing the scope of “core” bankruptcy jurisdiction, and ultimately concluded that withdrawal of the reference was not mandatory. Id. at 694-98. Specifically, the district court was satisfied that the bankruptcy court was competent to adjudicate Omni’s maritime lien claim. Id. at 698.
Relying on the district court’s holding in Millenium that it lacked the in rem jurisdiction required to exercise admiralty powers, Universal and LISCR argued that the bankruptcy court lacked jurisdiction to conduct a valid in rem judicial auction because the bankruptcy court’s jurisdiction is derivative of that of the district court. They did not contest, however, the authority of the bankruptcy court to rank the priority and validity of the maritime liens. Instead, they challenged the bankruptcy court’s jurisdiction to conduct a judicial auction that would conclusively expunge the vessels’ maritime liens under admiralty law in a manner that would receive international recognition.
The bankruptcy court disagreed with counsel’s reading of Millenium as depriving the bankruptcy court of jurisdiction to conduct the sale. The bankruptcy court observed that the vessels under arrest in other jurisdictions were being held in violation of the bankruptcy stay and any sale in foreign jurisdictions of those arrested vessels would be a “nullity” in light of the bankruptcy proceeding. Responding to the question of “whether or not this so- *88 called judicial sale, free and clear of all maritime liens, supposedly under admiralty law, is actually going to hold up internationally,” Judge Blackshear acknowledged the possibility that a foreign court might not recognize the sale.
Judge Blackshear granted the Sale Motion and issued a Sale Order that stated in relevant part that
the Assets shall be transferred to the purchaser(s) free and clear of all mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, ... provided, however, that the Assets shall be transferred subject to such Lien and related Claim, if any, held by any party listed on Schedule A attached hereto (each an “Objecting Lien Party”) that the Court finds, after due notice and a hearing, is superior in right to the Lien and related Claim of the Indenture Trustee and such finding, if any, shall be limited to the amount alleged and for the particular reasons so alleged, by such Objecting Lien Party in the respective objection filed to the Motion.
Allfirst, the Indenture Trustee, was the successful and only bidder for eighteen of the vessels.[2] Debtors’ estate did not profit from the sales, because each vessel’s outstanding mortgage exceeded the purchase price.
At the conclusion of this proceeding, the bankruptcy court turned to arrangements for an expedited adversary proceeding that would resolve the maritime hens asserted by the parties objecting to the sale, including Universal, LISCR and Praxis. The court addressed debtor’s counsel in the following colloquy:
The Court: ... When can you file this adversary proceeding?
[Debtor’s counsel]: ... By Tuesday of next week we would file a [bare-]bones adversary proceeding[], naming all of the Creditors and attaching their pleadings. Obviously naming [Allfirst] and Wayland and we would probably request a hearing date.
The bankruptcy court did not specify whether lienors would be denominated as plaintiffs or as defendants in that adversary proceeding.

b. The April 17, 2002 Adversary Proceeding and Hearing

On April 4, 2002, Millenium’s counsel filed an adversary action to resolve the priority of the maritime liens asserted by Wayland and by the parties who had objected to the sale. Each of the objecting parties who had previously asserted maritime liens in their notices of objection to the Sale Motion, including Universal, LISCR and Praxis, were named as plaintiffs in the adversary proceeding. Way-land and Allfirst were named as defendants.
Judge Blackshear held a scheduling and discovery conference on April 17, 2002. At the conference, Universal and LISCR objected that debtors had filed the adversary proceeding in the lienors’ names, denominating them plaintiffs rather than defendants. Universal and LISCR maintained that appellees Wayland and Allfirst should have been the named plaintiffs. The court responded that it had ordered the debtors to file the proceeding. Universal and LISCR argued that this procedure was *89 improper and implicated their rights to a jury and right to withdraw the reference from the bankruptcy court, the burdens of proof, the inferences that could be drawn, and discovery rights. The bankruptcy court, explaining its reasons for conducting the expedited adversary proceedings in this manner, offered the opportunity for objectors to withdraw:
The Court: You know what it is, if I had waited for all the parties to bring in their adversary piecemeal this matter would be going on to the year 2004. What I attempted to do, for both your client and the rest of the parties, was to get this matter before me in an expedited manner. If you don’t like that, you could basically move, make a motion to have your client taken off the list and I would be more than happy to grant that.
[Counsel]: I can’t. I don’t like to have to deal with it.
The Court: I don’t care about what you like about it. If you wish to have your client taken out of the adversary proceeding, I will be happy to accommodate that.
Counsel declined to withdraw, but continued to maintain that the procedure was improper because it implicated his clients’ substantive rights. The bankruptcy court responded that Wayland and Allfirst’s role as defendants in the adversary proceeding was “[procedural only.” The court suggested that lienors would lose no substantive rights in the adversary proceeding by being denominated plaintiffs, and that counsel’s objections amounted to “basically elevat[ing] form over substance.”[3]
c. The Motions for Summary Judgment
Appellees Allfirst and Wayland moved for summary judgment on the lien claims asserted by lienors on May 31, 2002. Ap-pellees’ motion for summary judgment against LISCR asserted that there was no genuine issue of material fact concerning (1) the fact that Allfirst’s first preferred ship mortgages were validly executed and duly registered under the laws of Liberia and (2) that admiralty law ranked LISCR’s claim for Liberian tonnage taxes at a lower priority than that of Allfirst’s first preferred ship mortgages, because LISCR’s claims constituted state-created liens of a maritime nature. Appellees’ motion for summary judgment against Universal similarly argued that there was no genuine issue of material fact regarding (1) the fact that Allfirst’s first preferred ship mortgage was validly executed and duly registered under the laws of Liberia and (2) the fact that admiralty law ranked Universal’s claim for the delivery of fuel bunkers at a lower priority than that of Allfirst’s first preferred ship mortgage, because Universal’s delivery of the bunkers in Panama constituted a claim for necessaries furnished outside the United States. All-first’s motion for summary judgment against Praxis principally argued that (1) Praxis’ maritime lien for the unpaid fuel bunkers was subordinate to Allfirst’s foreign preferred ship mortgages because the bunkers of fuel furnished by Praxis in *90 various ports around the world were necessaries supplied outside the United States and (2) Praxis’ objection to the Sale Motion had failed to state claims for tort or fraudulent inducement.
In their responsive motions, lienors elaborated upon the maritime lien claims they had raised in their objections to the Sale Motion. LISCR argued that it had provided “registry services” to debtors in the United States and that those services constituted a lien for necessaries under maritime law. Universal asserted that (1) the bunkers Universal had furnished were necessaries under maritime law and (2) Universal had maritime lien claims of tortious conversion because at the time of delivery and consumption of the fuel, debtors had not intended to pay for the bunkers, and admiralty law ranked maritime tort liens over Allfirst’s mortgages. Praxis disavowed that its maritime liens arising from the bunker deliveries were claims for necessaries. Instead, Praxis argued that its lien claims sounded in maritime tort for conversion and were therefore superior to Allfirst’s mortgages because the debtors had negotiated for and consumed the bunkers in bad faith. None of the appealing lienors set forth evidence disputing the validity of Allfirst’s foreign preferred ship mortgage liens.
Judge Blackshear granted summary judgment to appellees on July 10, 2002.
2. The District Court Proceedings
Lienors appealed to the district court for the Southern District of New York (Patterson, J.), which issued two opinions affirming the grants of summary judgment. See Universal I, 2004 WL 63501; Praxis I, 2003 WL 22939112. In Universal I, the district court held that the bankruptcy court had subject matter jurisdiction to conduct the adversary proceeding following the auction of the debtors’ assets. It found that the dispute involved “the resolution of rights enumerated in the Sale Order” and that “the Sale Motion and related adversary proceedings were core proceedings under 28 U.S.C. § 1334.” Universal I, 2004 WL 63501, at *5. Universal and LISCR had also argued that the Sale Order, by its terms, had extinguished Allfirst’s own liens, thereby depriving the bankruptcy court of any core jurisdiction to hold a subsequent adversary proceeding in the absence of any effect on the debtors’ estate. The district court rejected this argument as contrary to the logic of the Sale Order. In addition, because the bankruptcy court retains jurisdiction to interpret and enforce its own orders, the district court reasoned that the bankruptcy court had valid jurisdiction to conduct the adversary proceeding.
The district court also held that the filing of the adversary proceeding naming lienors as plaintiffs had not deprived lien-ors of any substantive rights: “The adversary proceeding does not differ substantially from an interpleader action. Furthermore, the Bankruptcy Judge gave appellants’ counsel an opportunity to have their clients removed as plaintiffs, and offered them a stay pending appeal when they requested a jury trial, offers which appellants did not pursue.” Because Universal and LISCR did not dispute that Allfirst’s mortgages were validly executed and duly registered in Liberia, the district court held that the only issue before it was whether a genuine issue of material fact existed with respect to the priority of Allfirst’s ship mortgages over lienors’ claims to maritime liens of tort and necessaries.
The court held that no genuine issue of material fact existed as to the superiority of Allfirst’s ship mortgage over LISCR’s claim for Liberian tonnage taxes. The district court noted that LISCR’s Local *91 Rule 56.1 submission,[4] without citation to supporting evidence, attempted to make a claim for necessaries consisting of “registry services,” but that LISCR’s notice of objection to the Sale Motion had claimed tonnage taxes, not necessaries. Furthermore, even if these tonnage taxes were “necessaries” under the Ship Mortgage Act, they would only be prioritized above Allfirst’s foreign ship preferred mortgages if they were provided within the United States, which they obviously were not.
The district court also held that there was no genuine issue of material fact that Allfirst’s mortgages were superior to Universal’s lien claims of tort and conversion for the fuel bunkers. The court noted that Universal had failed to provide supporting evidence that a bailment, rather than a contractual relationship, had been created when Universal delivered the bunkers.[5] Accordingly, Universal had failed to state a maritime tort claim for conversion. In addition, because Universal admitted that it had delivered the bunkers to the Milleni-um vessels outside the United States, the court found that Universal’s claim for necessaries was subordinate to Allfirst’s foreign registered mortgage under the plain language of 46 U.S.C. § 31326.
Similarly, in Praxis I, the district court held that Praxis had failed to state maritime tort claims of conversion for its fuel deliveries that would have a superior rank to Allfirst’s mortgage claims. The district court noted that the supporting evidence provided by Praxis contemplated a contractual relationship upon the delivery of the bunkers, rather than the creation of a bailment. In addition, Praxis’ allegations of bad-faith negotiations by debtors did not satisfy the conditions of maritime tort because debtor’s alleged acts did not occur on navigable waters and in connection with maritime activity. Because Praxis did not dispute that the bunkers were supplied outside the United States, the court held that Praxis’ claim of necessaries was subordinate to the foreign preferred ship mortgages.
This appeal followed, and the cases were argued before this Court in tandem.
DISCUSSION
We note that the bankruptcy court permitted debtors to file an adversary proceeding on lienors’ behalf without lienors’ consent. While we are skeptical of the bankruptcy court’s assessment that counsel’s objections to this unorthodox procedure “elevat[ed] form over substance,” we agree with the district court that lienors waived their objections by declining the bankruptcy court’s offer to withdraw from the proceeding.
We address in this opinion the complex question of the scope of bankruptcy jurisdiction when the debtor’s estate consists of maritime assets.[6] The essence of lienors’ argument is that because the debtor’s estate consisted of vessels that had not been arrested within the district court’s jurisdiction, the bankruptcy court lacked subject matter jurisdiction to expunge lienors’ maritime liens from those vessels. They *92 argue that the judicial auction and subsequent adversary proceeding was not within the bankruptcy court’s jurisdiction by virtue of statute, Article III of the Constitution, and the admiralty court’s purportedly exclusive power to foreclose maritime liens. To permit a bankruptcy court to expunge maritime liens by judicial auction absent in rem jurisdiction over an arrested vessel, lienors argue, would “rewrite admiralty law.” But admiralty law has long allowed lienors to submit voluntarily to the equitable jurisdiction of another court, thereby empowering it to adjudicate and extinguish their liens. Because lienors submitted to the jurisdiction of the bankruptcy court, there is no conflict between bankruptcy and admiralty in this case. We hold that the bankruptcy court acted within the scope of its power, and no principle of admiralty law precluded it from doing so.
1. Jurisdictional Conflicts Between Admiralty and Bankruptcy, Generally
Jurisdictional conflicts between admiralty and bankruptcy have long perplexed courts and scholars.[7] On the one hand, Congress has granted the district courts expansive bankruptcy jurisdiction to adjudicate claims against a debtor’s estate. See, e.g., 28 U.S.C. § 1334(b), (e). The Supreme Court has analogized bankruptcy proceedings to those in admiralty, in that “the discharge of a debt by a bankruptcy court is similarly an in rem proceeding.” Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 446, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004). A bankruptcy action provides the debtor with a “fresh start ... despite the lack of participation of all of his creditors, because the court’s jurisdiction is premised on the debtor and his estate, and not on the creditors.” Id. As discussed in further detail below, the district court delegates its bankruptcy power to the bankruptcy courts. See 28 U.S.C. §§ 157, 158. The bankruptcy court’s in rem jurisdiction over a debtor’s estate, in turn, permits a determination of all claims that “anyone, whether named in the action or not, has to the property or thing in question.” Indeed, “[t]he proceeding is ‘one against the world.’ ” Hood, 541 U.S. at 448, 124 S.Ct. 1905 (citing 16 James Wm. Moore et al., Moore’s Federal Practice § 108.70[1], at 108-06 (3d ed.2004)).
On the other hand, while it has long been established that federal courts do not have exclusive jurisdiction in all admiralty matters, certain classes of cases are cognizable only in admiralty. Dluhos v. Floating and Abandoned Vessel, Known as “New York”, 162 F.3d 63, 71 (2d Cir.1998). Specifically, an in rem suit against a vessel to quiet title by expunging its *93 liens is “distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts” sitting in admiralty. Am. Dredging Co. v. Miller, 510 U.S. 443, 447, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (citing The Moses Taylor, 71 U.S. (4 Wall.) 411, 431, 18 L.Ed. 397 (1866)). In an in rem admiralty action, the “vessel or thing is itself treated as the offender and made the defendant by name or description in order to enforce a lien.” Madruga v. Super. Ct. of State of Cal., County of San Diego, 346 U.S. 556, 560, 74 S.Ct. 298, 98 L.Ed. 290 (1954). Traditional admiralty principles suggest that only a federal admiralty court acting in rem has the jurisdiction to quiet title to a vessel conclusively by extinguishing its maritime liens.[8] See Moran v. Sturges, 154 U.S. 256, 282, 14 S.Ct. 1019, 38 L.Ed. 981 (1894) (“[I]t has been settled so long, that we know not its beginning, that a suit in the admiralty to enforce and execute a lien, is not an action against any particular person to compel him to do or forbear anything, but a claim against all mankind; a suit in rem, asserting the claim of the libelant to the thing, as against all the world.” (internal citations and quotation marks omitted)); The Moses Taylor, 71 U.S. at 427 (suggesting that an action seeking to secure title of a vessel “against all the world” must necessarily be brought in rem); Gilmore & Black, The Law of Admiralty § 9-2 at 588 (explaining that maritime liens “can be ‘executed’ (which is the admiralty terminology for ‘foreclosed’) only by an admiralty court acting in rem.”). The in rem admiralty action, like the in rem adjudication of a bankruptcy estate, “establishes] title as against the whole world,”[9] Dluhos, 162 F.3d at 73; see The Moses Taylor, 71 U.S. at 427; cf. Madruga, 346 U.S. at 561, 74 S.Ct. 298 (holding state partition proceeding brought against co-owner of ship was “not in rem in the *94 admiralty sense” because co-owner, not the ship, was the defendant and therefore “the state does not affect the interests of others in the world at large, as it would if this were a proceeding in rem to enforce a lien”).
Lienors seeking to bring an admiralty action in rem face stringent access requirements before securing the aid of the federal court to enforce their liens. In particular, subject matter jurisdiction lies in the district court where the vessel or other res is located, but that jurisdiction does not attach until the vessel is arrested within the jurisdiction. See Fed.R.Civ.P. Supp. R. C(2), D; Mackensworth v. S.S. American Merchant, 28 F.3d 246, 252 (2d Cir.1994) (citing Am. Bank of Wage Claims v. Registry of Dist. Court of Guam, 431 F.2d 1215, 1218 (9th Cir.1970)); see also The Resolute, 168 U.S. 437, 439, 18 S.Ct. 112, 42 L.Ed. 533 (1897) (“Jurisdiction ... [a]s applied to a suit in rem for the breach of a maritime contract ... [p]re-supposes — First, that the contract sued upon is a maritime contract; and second, that the property proceeded against is within the lawful custody of the court.”); The Rock Island Bridge, 73 U.S. (6 Wall.) 213, 215, 18 L.Ed. 753 (1867) (“The lien and the proceeding in rem are, therefore, correlative — where one exists, the other can be taken, and not otherwise.”).
When a debtor’s estate consists primarily of maritime assets, therefore, a measure of uncertainty exists regarding the propriety of the bankruptcy court’s jurisdiction to sell those assets wholly free of maritime liens. The doctrine of custodia legis has typically been invoked to resolve this apparent conflict between bankruptcy proceedings and admiralty actions in rem. Under that doctrine, derived from principles of comity, the court that first secures custody of the property administers the property. Hellenic I, 38 B.R. at 996 (citing del Y Cia S.A. v. Nereide Societa Di Navigazione per Azioni, 28 B.R. 378, 1983 A.M.C. 1192, 1194 (E.D.Va.1983)); see The Casco, 230 F. 929 (D.Mass.1916); Landers, supra, at 493-94; see also In re McLean Indus., Inc., 857 F.2d 88, 90 (2d Cir.1988) (dismissing without prejudice bankruptcy appeal brought by seamen seeking to enforce lien priority upon vessels in custody of High Court of Singapore in order to permit that court to rule first on the dispute). Compare The Robert & Edwin, 32 F.2d 390 (D.Mass.1929) (rejecting argument that admiralty was the better forum for adjudicating the maritime liens in question, and declining to relinquish bankruptcy jurisdiction of voluntary bankrupt shipowner in face of subsequent admiralty proceeding because assets were in custodia legis), with The Philomena, 200 F. 859, 861 (D.Mass.1911) (refusing to relinquish admiralty jurisdiction in face of subsequent bankruptcy proceeding because “it is settled that the admiralty courts have exclusive jurisdiction over maritime liens, and that as other courts are without power to establish and enforce such liens, so they are without power to displace them.”). But see In re Modem Boats, Inc., 775 F.2d 619, 620 (5th Cir.1985) (holding that the “admiralty court’s previous acquisition of in rem jurisdiction ... did not defeat the bankruptcy court’s jurisdiction” because' the “petition for reorganization withdrew jurisdiction from the admiralty court and lodged it exclusively in the district court” where the Title 11 proceeding was pending, and bankruptcy court “inherited that jurisdiction” from the district court by virtue of referral under 28 U.S.C. § 157(a)) (internal citations omitted). In the instant case, custodia legis has no impact on the facts before us, because no other court has asserted jurisdiction to adjudicate the liens *95 in question.[10] Nonetheless, the doctrine’s existence supports the proposition that bankruptcy courts, as a historical matter, have been considered competent to adjudicate specific lienors’ maritime liens.
While bankruptcy courts have adjudicated the validity and priority of maritime liens asserted against debtors’ maritime assets for nearly a century, see, e.g., Hellenic I, 38 B.R. at 995; Empire Stevedoring Co. v. Oceanic Adjusters, Ltd., 315 F.Supp. 921, 925 (S.D.N.Y.1970); The Robert & Edwin, 32 F.2d 390, 390 (D.Mass.1929)[11]; Paul N. Daigle & Jerome C. Scowcroft, Payment for Supplies and Services Furnished in Maritime Commerce, 18 J. Mar. L. & Com. 379, 384 n. 167 (1987) (collecting cases), the particular question of whether a bankruptcy court may enforce and foreclose maritime liens over a lienor’s objections has not been conclusively settled. See, e.g., Millenium, 275 B.R. at 697-98; Gilmore & Black, §§ 9-91, 95 at 806-07, 816-17; Landers, supra, at 506-07.
Here, we resolve only the narrow question of whether a bankruptcy court may adjudicate maritime liens where the lienors voluntarily submit to its jurisdiction. To do so, we must decide: (1) whether the bankruptcy court acted consistently with its statutory grant of subject matter jurisdiction,[12] and constitutional limits on that jurisdiction, when it adjudicated this estate; (2) whether the maritime character of the assets and the lien claims deprived the bankruptcy court of its jurisdiction to adjudicate this estate, and (3) whether lienors’ specific claims have been conclusively and properly extinguished. As discussed in further depth below, we hold that the bankruptcy court had subject matter jurisdiction over the estate, both as a matter of statutory interpretation and because lienors consented to the bankruptcy court’s equitable jurisdiction to adjudicate their claims. We hold further that the maritime character of the estate did not deprive the bankruptcy court of that jurisdiction. Finally, we need not decide whether a bankruptcy judge adjudicating a debtor’s maritime assets unconstitutionally wields a power reserved exclusively to district court acting in admiralty, because, as discussed below, admiralty law itself allows individual lien claims *96 to be expunged when lienors have submitted their claims to the equitable jurisdiction of another court. We therefore hold that lienors, by litigating their maritime liens before the bankruptcy court, consented to the bankruptcy court’s equitable jurisdiction to adjudicate and extinguish their liens, and that lienors’ claims are now extinguished.
2. The Bankruptcy Court’s Subject Matter Jurisdiction over Debtors’ Estate
A primary goal of bankruptcy law is to centralize adjudication of a bankrupt’s estate into a single court. The Bankruptcy Code includes a broad grant of subject matter jurisdiction over a debtor’s property: “The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.” 28 U.S.C. § 1334(e). In addition, “[notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.” 28 U.S.C. § 1334(b).
Bankruptcy courts are extensions of the federal district courts. After a plurality of the Supreme Court struck down expansive jurisdiction for bankruptcy judges under the Bankruptcy Act of 1978, Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), see Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1577-78 (2d Cir.1983), Congress reshaped the jurisdictional relationship between the district courts and the bankruptcy courts in the Bankruptcy Amendments and Federal Judgeship Act of 1984 (“BAFJA”) by making the bankruptcy courts delegated adjuncts of the district court. See Luan Inv. S.E., v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 228-29 (2d Cir.2002); U.S. Lines, Inc. v. Am. S.S. Owners’ Mut. Prot. and Indem. Ass’n (In re U.S. Lines, Inc.), 197 F.3d 631, 636-37 (2d Cir.1999); see also 28 U.S.C. § 157(a) (authorizing district courts to refer “any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11” to bankruptcy judges). The scope of the bankruptcy judge’s authority, in turn, hinges on whether the bankruptcy proceeding is “core” or “non-core.” 28 U.S.C. § 157; In re U.S. Lines, 197 F.3d at 636. In a core proceeding, the bankruptcy court has “comprehensive power,” In re Petrie Retail, 304 F.3d at 228, to “hear and determine all cases” and “may enter appropriate orders and judgments” subject to review by the district court. 28 U.S.C. §§ 157(b)(1), 158. “A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization.” In re Petrie Retail, 304 F.3d at 230. For non-core proceedings that otherwise relate to the bankruptcy case under title 11, “the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court.” 28 U.S.C. § 157(c)(1).
We agree with the district court that the adversary proceeding before the bankruptcy court ranking the priority of the maritime lien claims was a core proceeding. Universal I, 2004 WL 63501, at *5. First, the nature of the proceeding falls squarely within the statutory criteria for a core proceeding as well as our Circuit’s standards for identifying core proceedings. Second, because even a non-core proceeding can be transformed into a core proceeding by the conduct of the lienors *97 themselves, lienors’ own actions rendered the adversary proceedings core.

a. Criteria for Core Proceedings

We are satisfied that the adversary proceeding was a core proceeding under the plain language of the Bankruptcy Code. The Code specifies a non-exhaustive list of core proceedings including, inter alia, “allowance or disallowance of claims against the estate,” “determinations of the validity, extent, or priority of liens,” “orders approving the sale of property,” as well as “other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.” 28 U.S.C. § 157(b)(2)(B), (K), (N), (0).
When deciding whether a contract action is a core proceeding we have considered “(1) whether a contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization.” In re U.S. Lines, 197 F.3d at 637. The latter inquiry depends upon the “ ‘nature of the proceeding.’” Id. (quoting S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.), 45 F.3d 702, 705 (2d Cir.1995)). A proceeding’s nature can be core “if either (1) the type of the proceeding is unique to or uniquely affected by the bankruptcy proceeding, or (2) the proceeding directly affects a core bankruptcy function.” Id. (internal citations omitted). Core bankruptcy functions include “fixing the order of priority claims against a debtor, placing the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors, and administering all property in the bankrupt’s possession.” Id. (internal citations and quotation marks omitted); see also In re Petrie Retail, 304 F.3d at 229-30 (post-petition dispute between two non-debtors over pre-petition lease was core, inter alia, because dispute “was based on rights established in the sale order” and was “uniquely affected by and inextricably linked to the bankruptcy court’s sale order” (internal quotation marks omitted)). Here, the Sale Order approving the sale of the fleet expressly provided that the assets would be sold subject to the prioritization of objecting lienors’ liens. The adversary proceeding was the mechanism by which the bankruptcy court enforced those terms. Thus, the “nature” of the adversary proceeding was unique to the bankruptcy proceeding and the proceeding directly affected a core bankruptcy function. See In re U.S. Lines, 197 F.3d at 637.
Finally, we are unmoved by lienors’ argument that the judicial auction liquidating debtors’ estate pursuant to the Sale Order deprived the bankruptcy court of subject matter jurisdiction to conduct a subsequent adversary proceeding to rank the objecting lienors’ maritime claims as set forth in the Sale Order. Bankruptcy courts retain jurisdiction to enforce and interpret their own orders. In re Petrie Retail, 304 F.3d at 230. As already discussed, the adversary proceeding was intended to accomplish a discrete goal of the Sale Order and the bankruptcy court retained jurisdiction following the auction to effectuate that goal. Cf. In re Manville Forest Prod. Corp., 896 F.2d 1384, 1390 (2d Cir.1990) (“[The creditor] .... is not a third party related only peripherally to the adjudication of [the] bankruptcy case. The determination of the objection to and allowance of its claim is clearly within the traditional core jurisdiction of the bankruptcy court.”).

*98
b. Proceedings Rendered Core by Conduct of the Parties

The adversary proceeding fell within the core jurisdiction of the bankruptcy court for another reason. Parties may, by their conduct, submit themselves to the bankruptcy court’s jurisdiction. This Circuit has clearly established that parties, like lienors, who submit proofs of claim and thereafter actively litigate in the bankruptcy court without contesting personal jurisdiction can transform a non-core proceeding into a core one. In In re Petrie Retail, 304 F.3d at 231, we declined to decide whether filing proofs of claim sufficed to invoke bankruptcy jurisdiction because the creditor had also “appeared in the debtor’s bankruptcy proceeding, filed a motion with the bankruptcy court seeking determination and payment of its [claim], and submitted objections to the debtors’ motion[s],” raised no objection “to the personal jurisdiction of the bankruptcy court with regard to any proceedings related to its claim,” and thereby “submitted to and invoked the bankruptcy court’s jurisdiction over its claim.” Id. Here, we similarly need not reach the question of whether filing the notices of objection to the Sale Order alone sufficed to submit lienors to the bankruptcy court’s equitable jurisdiction, because they did much more than file a notice of claim. They actively litigated their lien claims through to the conclusion of the adversary proceeding, declined to withdraw from the proceeding when given an opportunity to do so, and never disputed personal jurisdiction. See id.; see also Langenkamp v. Culp, 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (“[B]y filing a claim against a bankruptcy estate the creditor triggers the process of ‘allowance and disallowance of claims,’ thereby subjecting himself to the bankruptcy court’s equitable power.”) (quoting Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 58-59, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)); Cent. Vt. Pub. Serv., 341 F.3d at 191-92 (explaining two theories underpinning transformation of non-core into core proceeding: “(1) the proof of claim transforms litigation into a core proceeding; and (2) by filing the proof of claim, the creditor consents to the bankruptcy court’s broad equitable jurisdiction”); In re S.G. Phillips Constructors, 45 F.3d at 707 (“Invoking equitable jurisdiction in the bankruptcy context might be analogized to invoking a court’s jurisdiction by filing a complaint.... [B]y filing its proof of claim ... [the creditor] not only triggered § 157(b)(2) subject matter jurisdiction, but also necessarily submitted to the court’s equitable power to resolve its claims.”); First Fid. N.A., N.J. v. Hooker Invs. Inc. (In re Hooker Invs., Inc.), 937 F.2d 833, 838 (2d Cir.1991) (“[A] creditor who invokes the bankruptcy court’s equitable jurisdiction to establish a claim against a debtor’s estate is also subject to the procedures of equity in the determination of preference actions brought on behalf of the estate.”).
In sum, the bankruptcy court acted well within its core jurisdiction when it conducted the adversary proceeding pursuant to the Sale Order. Were debtors’ assets non-maritime in nature, our analysis would end here. Lienors further argue, however, that the maritime character of those assets deprived the bankruptcy court of subject matter jurisdiction. We turn now to consideration of that issue.
3. The Maritime Character of Debtors’ Assets Did Not Deprive the Bankruptcy Court of its Jurisdiction
Because of the maritime character of the assets, lienors claim that the proceeding cannot be core because the bankruptcy court, as a non-Article III court, is constitutionally forbidden from adjudicating admiralty matters in light of Northern *99 Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). They contend that an action to expunge maritime liens from a vessel “is the essence of an admiralty suit” lying at “the protected core of Article III judicial power,” and thus is beyond the jurisdiction of the bankruptcy court. The admiralty issues at stake this case, however, did not deprive the bankruptcy court of its core jurisdiction. Nothing in Marathon or in our subsequent precedent remotely suggests that adjudicating admiralty claims deprives the bankruptcy court of its subject matter jurisdiction to adjudicate the estate.

a. The Constitution Limits Norir-Arti-cle III Courts’ Ability to Exercise Article III Powers

The distinction between core and non-core bankruptcy proceedings originated in Marathon, in which the Supreme Court considered the constitutionality of bankruptcy court jurisdiction under Article III of the constitution. In re Petrie Retail, 304 F.3d at 228. A plurality of the Court observed that “the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages.” Marathon, 458 U.S. at 71, 102 S.Ct. 2858. Marathon principally held that “Congress has minimal authority to control the manner in which ‘a right created by state law, a right independent of and antecedent to the reorganization petition that conferred jurisdiction upon the Bankruptcy Court’ may be adjudicated.” In re U.S. Lines, 197 F.3d at 637 (quoting Marathon, 458 U.S. at 84, 102 S.Ct. 2858); see also Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 584, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (discussing narrow holding of Marathon and observing that the Marathon plurality “was unable to agree on the precise scope and nature of Article Ill’s limitations”). As we discussed in In re Kaiser, “Marathon only invalidated the jurisdiction of the bankruptcy court to make final determinations in matters that could have been brought in a district court or a state court .... In no way did Marathon implicate the jurisdiction of the bankruptcy courts in other matters within the ‘traditional’ bankruptcy jurisdiction.” 722 F.2d at 1580 (internal citations omitted).
Since BAFJA’s enactment in 1984, “ ‘both the Supreme Court and this Court have concluded that the Marathon holding was a narrow one and have broadly construed the jurisdictional grant in [BAF-JA].”’ Cent. Vt. Pub. Serv. Corp., 341 F.3d at 191 (quoting In re S.G. Phillips Constructors, 45 F.3d at 707). BAFJA permits district courts to delegate their bankruptcy powers to the bankruptcy courts. 28- U.S.C. § 157. The delegation of bankruptcy powers to bankruptcy courts has been consistently found constitutional under Article III., See In re Kaiser, 722 F.2d at 1578-80; see also In re Comm. of Unsecured Creditors of F S Communications Corp., 760 F.2d 1194, 1198 (11th Cir.1985). Bankruptcy courts, for example, “are not precluded from adjudicating state-law claims [as core proceedings] when such claims are at the heart of the administration of the bankruptcy estate.” Cent. Vt. Pub. Sew. Corp., 341 F.3d at 191 (internal citation and quotation marks omitted). The same logic applies to admiralty claims lying at the heart of the administration of the bankruptcy estate. See In re S.G. Phillips Constructors, 45 F.3d at 705 (“Because nothing is more directly at the core of a bankruptcy administration ... than the quantification of all liabilities of the debtor, the bankruptcy court’s determination whether to allow or *100 disallow a claim is a core function.” (internal citation and quotation marks omitted)).
We note further that the current statutory grant of subject matter jurisdiction to the district courts, providing that “Mot-withstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11,” 28 U.S.C. § 1334(b), evinces congressional intent “to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.” Celotex Corp. v. Edwards, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (internal citations and quotation marks omitted). To the extent that this grant of jurisdiction is in tension with the putative exclusivity of admiralty jurisdiction, it should be recalled that “[t]he framers of the Constitution did not contemplate that the maritime law should remain unalterable .... When the Constitution was adopted, the existing maritime law became the law of the United States ‘subject to power in Congress to alter, qualify or supplement as experience or changing conditions might require.’ ” The Barium, 293 U.S. at 38, 55 S.Ct. 31 (quoting Panama Ry. Co. v. Johnson, 264 U.S. 375, 385, 44 S.Ct. 391, 68 L.Ed. 748 (1924)); cf. O’Connell Machinery Co., Inc. v. M.V. “Americana", 734 F.2d 115, 117 (2d Cir.1984) (rejecting under Barium the argument that Congress violated Article III by immunizing vessels of foreign states from in rem attachment, thereby changing a traditional aspect of maritime law).
There has been some lingering confusion regarding the scope of a bankruptcy judge’s authority to adjudicate admiralty matters under the Bankruptcy Amendments and Federal Judgeship Act of 1984 (“BAFJA”), enacted after a plurality of the Supreme Court in Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), struck down expansive jurisdiction for bankruptcy judges under the Bankruptcy Reform Act of 1978 (“Bankruptcy Reform Act”). While the Bankruptcy Reform Act specifically granted admiralty jurisdiction to the bankruptcy courts, see 28 U.S.C. § 1481 (repealed) (“A bankruptcy court shall have the powers of a court of equity, law and admiralty ... ”), that provision is now “omitted” from the United States Code. See John H. Strasburger, The ABC’s of Admiralty and Bankruptcy in Concert or Conflict, 21 J. Mar. L. & Com. 273, 275 & n. 7 (1990) (describing legislative confusion over whether § 1481 was “omitted,” “repealed,” or simply rendered “ineffective” by BAFJA). This legislative history perhaps suggests that Congress, responding to Marathon, wanted to avoid provocatively empowering the bankruptcy courts to exercise all admiralty powers. It does not suggest a blanket exception to bankruptcy jurisdiction for all maritime matters, and we decline to construe the omission as an attempt to limit the power of the bankruptcy courts.

b. The Putative Exclusivity of Admiralty Courts’ Power to Extinguish Maritime Liens

We do not reach the question of whether the bankruptcy court’s Sale Order purporting to sell the vessels “free and clear” of its liens wielded admiralty power within the meaning of Article III, because even if it did so, that power was not exclusively reserved to admiralty. Therefore, whether or not the bankruptcy court wielded admiralty power, it did not trespass on terrain reserved for Article III courts.
*101 Article III of the United States Constitution extends “judicial power” to three classes of cases: (i) “cases in law and equity, arising under this constitution, the laws of the United States, and treaties,” (ii) “cases affecting ambassadors, or other public ministers and consuls,” and (iii) “cases of admiralty and maritime jurisdiction.” U.S. Const, art. III. “The constitution certainly contemplates these as three distinct classes of cases; and if they are distinct, the grant of jurisdiction over one of them, does not confer jurisdiction over the other two. The discrimination made between them, in the constitution, is ... conclusive against their identity.” Amer. Ins. Co. v. Canter, 26 U.S. (1 Pet.) 511, 545, 7 L.Ed. 242 (1828). An admiralty case does not “arise” under the Constitution or the laws of the United States. Id. at 545-46; see Paduano v. Yamashita, 221 F.2d 615 (2d Cir.1955) (interpreting 28 U.S.C. § 1331 and holding that Congress did not intend to include within scope of federal question jurisdiction claims based solely on general maritime law); see also 46 U.S.C. § 31343(c)(2) (“The district courts of the United States shall have jurisdiction over a civil action in Admiralty to declare that a vessel is not subject to a lien claimed under subsection (b) of this section ... regardless of the amount in controversy or the citizenship of the parties.”). Rather, admiralty provides an independent source of subject matter jurisdiction for admiralty actions. Canter, 26 U.S. at 546; see also United States v. ZP Chandon, 889 F.2d 233, 236-37 (9th Cir.1989); Gilmore & Black, § 1-9, at 19.
As noted supra, “[ajdmiralty’s jurisdiction is ‘exclusive’ only as to those maritime causes of action begun and carried on as proceedings in rem, that is, where a vessel or thing is itself treated as the offender and made the defendant by name or description in order to enforce a
lien.” Madruga, 346 U.S. at 560, 74 S.Ct. 298. For example, in Dluhos, we held that a diversity plaintiff seeking to quiet title “as against the world” to an abandoned vessel under 28 U.S.C. § 1655, which permits courts to quiet title to personal property of an absent defendant, was barred because his action was effectively an admiralty action, and he had failed to meet the requirements of admiralty by arresting the vessel. 162 F.3d at 72-73. In considering whether the action plaintiff had brought bore the “hallmarks of a typical in rem action,” we noted (1) that the § 1655 action required the res to be in the constructive possession of the court, (2) that remedies for such actions were limited to the res at issue, and therefore an in personam claim “seeking a judgment against a person rather than the property at issue will not permit application of the statute,” and (3) that plaintiff sought title as against the whole world. Id. Accordingly, we concluded that plaintiffs action was effectively an admiralty in rem action that failed because he had failed to meet the strict admiralty requirements of arresting the vessel within the jurisdiction. Id. at 73. In contrast, in Madruga, the Supreme Court held that a state partition proceeding brought against a ship’s co-owner was “not in rem in the admiralty sense.” 346 U.S. at 561, 74 S.Ct. 298. “[T]he state court in this proceeding acts only upon the interests of the parties over whom it has jurisdiction in personam, and it does not affect the interests of others in the world at large, as it would if this were a proceeding in rem to enforce a lien.” Id.
In the instant case, the bankruptcy court, proceeding in rem over the debtors’ estate, see Hood, 541 U.S. at 446, 124 S.Ct. 1905, purported to deliver the vessels “free and clear of all ... liens” to the buyer of the vessels. Whatever “hallmarks of a typical in rem action,” Dluhos, 162 F.3d at 73, may or may not exist in this context, *102 however, we simply need not address the murky question of whether the bankruptcy court improperly wielded the admiralty power that is “within the exclusive province of the federal courts,” Am. Dredging Co., 510 U.S. at 447, 114 S.Ct. 981. As will be discussed further, because lienors submitted their maritime lien claims to the bankruptcy court for adjudication in the adversary proceeding, they submitted themselves to the bankruptcy court’s equitable jurisdiction, thereby invoking one of admiralty’s exceptions to the exclusivity of the in rem proceeding. Therefore, as a matter of admiralty law, lienors’ liens have been properly extinguished.
c. Because Lienors Voluntarily Submitted to the Jurisdiction of the Bankruptcy Court, Admiralty Jurisdiction Was Not Exclusive
As noted supra, the jurisdiction of the federal admiralty courts has never been wholly exclusive. State courts, for example, may exercise in personam jurisdiction over litigants to provide remedies to causes of action that are cognizable under both admiralty and state law. See 28 U.S.C. § 1333(1); Am. Dredging Co., 510 U.S. at 446-47, 114 S.Ct. 981; Dluhos, 162 F.3d at 71. Additionally, proceedings other than in rem admiralty actions have extinguished individual lienors’ rights to their maritime liens, which refutes lienoi's’ suggestion that only an admiralty court has jurisdiction to extinguish a maritime lien. A line of older admiralty cases holds that individual lienors may have their rights to enforce maritime liens extinguished when they submit themselves voluntarily to the equitable jurisdiction of another court.
In Hudson v. N.Y. & Albany Transportation Co., 180 F. 973 (2d Cir.1910), for example, the issue was the power of a federal court, in administering an equity receivership, to sell a vessel free of maritime liens. Id. at 975. We held that the maritime lienors had consented to the sale free of their liens by appearing in the equity proceeding and placing the lien before the court for adjudication. Id. at 976 (“[W]e are of the opinion that, by thus coming into the court which had possession of the res and asking for adjudication upon the lien, the petitioner should be held to have assented to that jurisdiction for all purposes, including a substitution of the proceeds for the res .... ”); cf. Moran, 154 U.S.at 27, 14 S.Ct. 1098 (“[Sjtate courts, exercising equitable jurisdiction, might undertake, in the distribution of property, to save the rights of holders of maritime liens, yet it is certain that those courts would have no power by a sale under statute to destroy their liens unless they had voluntarily submitted themselves to that jurisdiction.”); James Rees & Sons Co. v. Pittsburgh & Cincinnati Packet Line, 237 F. 555, 560-61 (3d Cir.1916) (applying rule of consent in equitable receivership proceeding to plaintiffs because by virtue of being plaintiffs in receivership proceeding they consented to sale of boats free of liens and encumbrances); Gilmore & Black, § 9-95 at 816 (noting that the “traditional view was that the insolvency court lacked jurisdiction [to sell a ship free of liens or to adjudicate lien priority], at least in the absence of ‘voluntary submission’ by the lienors which was somehow supposed to cure the jurisdictional defect.”); Landers, supra, at 499-506 (criticizing rationale of Hudson and Moran but concluding that “the power of a federal court to enforce maritime liens upon consent seems to have been conclusively settled”).
We hold that lienors assented to the bankruptcy court’s equitable adjudication of their lien claims under principles of admiralty law. They placed their lien claims for adjudication before the bank *103 ruptcy court, not only by filing their notices of objection, but by remaining in the action, and by litigating their liens actively through the adversary proceeding. Despite their objection to subject matter jurisdiction, by coming into the court which had statutory jurisdiction over the res “and asking for adjudication upon the hen,” lienors “should be held to have assented to that jurisdiction for all purposes, including a substitution of the proceeds for the res.” Hudson, 180 F. at 976. At oral argument, lienors contended that the bankruptcy court could enjoin them from pursuing subsequent attachment and enforcement proceedings in foreign admiralty courts, but could not purport to extinguish their rights wholly. We reject this contention. Lienors are not merely enjoined from liquidating their maritime liens in the admiralty courts of foreign jurisdictions; for the reasons discussed, we hold that their liens have been extinguished as a matter of admiralty law. Because admiralty law does not claim exclusive jurisdiction on these facts, the bankruptcy court did not exercise jurisdiction reserved to the Article III courts.
We recognize that this opinion does not answer the question of whether the bankruptcy court could have expunged the vessels of their liens had it not had jurisdiction over the lienors.[13] Those who purchase maritime assets from a debtor’s estate under the auspices of a bankruptcy proceeding take a calculated commercial risk that they have not received clean title. Cf. The Robert & Edwin, 32 F.2d at 390 (observing that the “trustee in bankruptcy takes the schooner in the same plight and condition as she was held by the bankrupt, ie., subject to all valid maritime liens to be enforced with priorities according to the admiralty law”); In re Gucci, 309 B.R. 679, 683-84 (S.D.N.Y.2004) (holding that bankruptcy court may administer property of estate located in Italy, but observing that property’s fate “will ultimately be determined by Italian courts, which will give such weight as they think appropriate to the [bankruptcy] decision below”). Indeed, at oral argument, appellees explained that they had considered this precise risk calculus in bidding for debtors’ vessels, and that some foreign admiralty courts ultimately did not grant comity to the bankruptcy court’s adjudication of the liens.
Conversely, lienors who avoid the bankruptcy court in the hopes of liquidating their liens in a foreign admiralty court run the risk that a foreign court will recognize result of the bankruptcy adjudication, and that they thus forfeit their chance to argue for the enforcement of a superior lien. Cf. Empire Stevedoring Co. v. Oceanic Adjusters, Ltd., 315 F.Supp. 921, 925 (D.C.N.Y.1970) (“Although there is some question as to whether a bankruptcy court or an admiralty court is the proper forum, it is nevertheless clear that a valid maritime lien will be enforced against a ship which is the asset of a bankrupt shipowner (or one in reorganization).”).
Here, the bankruptcy court’s actions were consistent with admiralty law, so there is no reason to think there is a heightened risk that foreign courts will refuse to recognize the result of the bankruptcy adjudication. And our role is confined to assessing whether this bankruptcy court was competent to extinguish these lienors’ liens. For the reasons discussed, we are satisfied that the bankruptcy court *104 had subject matter jurisdiction to adjudicate the maritime assets of debtor’s estate where the lienors submitted their claims for adjudication to that court’s equitable jurisdiction. Further, for substantially the reasons given by the district court, we agree that there was no genuine issue of material fact as to the priority of Allfirst’s ship mortgages over lienors’ claims to maritime liens of torts and necessaries.
CONCLUSION
For the foregoing reasons, we Affiím the judgments of the district court.

. On this appeal, Universal, LISCR and Prax-is now share the same counsel.

. On April 5, 2002, Universal and LISCR filed a notice of appeal of the Sale Order, but allowed the appeal to go unperfected, and United States District Court Judge Denny Chin dismissed that appeal for failure to prosecute. In re Millenium Seacarrier, et al., No. 02 Civ. 3805 (S.D.N.Y. April 29, 2003). Prax-is did not file an appeal from the Sale Order.

. Counsel also expressed an intention to appeal, and Judge Blackshear asked if counsel wanted a stay pending appeal.
The Court: Do you wish to have a stay pending appeal?
[Counsel]: You already denied it, Your Honor.
The Court: Do you want an order?
[Counsel]: You told me to submit one if I wanted to. But given the fact that no one else is submitting orders around here, I decided I would go on record.
The Court: You do know that your appeal will probably be moot by the time the District Court takes it up.

. See 2d Cir. Local. R. 56.1.

. For example, Universal had not attached Universal’s standard terms and conditions of sale of marine bunkers. The district court noted that, had Universal submitted evidence that title of the bunkers did not pass to the vessels until payment, Universal might have provided a basis for its conversion argument.

.While Praxis did not join in Universal and LISCR's jurisdictional objections below, we consider the jurisdictional argument with respect to Praxis because of our continuing obligation to resolve whether the court below had subject matter jurisdiction. See Steel Co. v. Citizens for Better Env’t, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

. See, e.g., Millenium I, 275 B.R. 690 (S.D.N.Y.2002); Morgan Guaranty Trust Co. of New York v. Hellenic Lines Ltd.., 38 B.R. 987 (S.D.N.Y.1984) ("Hellenic I”); see generally Jonathan Landers, The Shipowner Becomes a Bankrupt, 39 U. Chi. L.Rev. 490 (1972) (discussing longstanding tensions between admiralty and bankruptcy courts). Judge Charles Haight, Jr. described the interaction between admiralty and bankruptcy jurisdiction as "the single most vexing current problem in United States admiralty and bankruptcy law.” Charles S. Haight, Jr., Current Developments in the American Law of Maritime Liens and Mortgages, 9 Mar. Law. 1, 12 (1984). See generally Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 9-2 at § 9-91 (2d ed.1975); Frank R. Kennedy, Jurisdictional Problems Between Admiralty and Bankruptcy Courts, 59 Tul. L.Rev. 1182 (1985); see also 3B Benedict on Admiralty § 43 (2004); John H. Strasburger, The ABC’s of Admiralty and Bankruptcy in Concert or Conflict, 21 J. Mar. L. & Com. 273, 273 (1990); Paul N. Daigle & Jerome C. Scow-croft, Payment for Supplies and Services Furnished in Maritime Commerce, 18 J. Mar. L. & Com. 379, 383-91 (1987); Hon. Lloyd King, A Chart of Bankruptcy Jurisdiction for Admiralty Lawyers, 59 Tul. L.Rev. 1264 (1985).

. Maritime liens are internationally recognized as providing the lienor the ability to arrest a vessel and hold it as security until an admiralty court can enforce a judgement. See Aurora Mar. Co. v. Abdullah Mohamed Fahem & Co., 85 F.3d 44, 48 (2d Cir.1996) (" 'The maritime lien differs from others in that it is (at least as far as ships are concerned) entirely independent of possession, is non-consentual [sic], and is commonly said not to be extinguished by transfer to a bona fide purchaser without notice of its existence.’ ” (quoting Gilmore & Black, § 1-12, at 36)); see also Gilmore & Black, at § 9-2, at 588-89 (describing peculiarities of maritime liens).

. Accordingly, the in rem action serves a central goal of admiralty law, namely, the protection of maritime commerce, see Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 608, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991), through the vindication of financial obligations acquired internationally. Among the primary aims for the framers of the Constitution in vesting admiralty jurisdiction in the federal courts was to assure national control over admiralty matters, as well as to assure '‘[c]omity with other nations and among the States.” Am. Dredging Co., 510 U.S. at 466, 114 S.Ct. 981 (Kennedy, J., dissenting); see id. ("At the time of the framing, it was essential that our prospective foreign trading partners know that the United States would ... respect the general maritime law ... The individual States needed similar assurances from each other."), accord California v. Deep Sea Research, Inc., 523 U.S. 491, 501, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998) ("The federal courts have had a unique role in admiralty cases since the birth of this Nation, because maritime commerce was ... the jugular vein of the Thirteen States. Accordingly, the need for a body of law applicable throughout the nation was recognized by every shade of opinion in the Constitutional Convention.” (internal citations and quotation marks omitted)). See also Detroit Trust Co. v. The Barium, 293 U.S. 21, 43, 55 S.Ct. 31, 79 L.Ed. 176 (1934) ("|T]he grant presupposed a 'general system of maritime law' which was familiar to the lawyers and statesmen of the country, and contemplated a body of law with uniform operation.” (quoting The Lottawanna, 88 U.S. (21 Wall.) 558, 575, 22 L.Ed. 654 (1874))).

. We therefore need not opine on whether provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA”) trump custodia legis, see In re Modern Boats, 775 F.2d 619, 620 (5th Cir.1985); Thomas J. Schoenbaum, 1 Admiralty & Maritime Law § 9-9 (4th ed.2004), or whether the fact that the pertinent bankruptcy proceeding is a reorganization or a liquidation impacts the role the doctrine plays in a bankruptcy court's decision to adjudicate the estate. See, e.g., Morgan Guaranty Trust Co. of New York v. Hellenic Lines Ltd., 585 F.Supp. 1227, 1229 (S.D.N.Y.1984) ("Hellenic Lines II”).

. Prior to 1978, these cases were decided under the Bankruptcy Act of 1898, Ch. 541, 30 Stat. 544 (1898) ("1898 Act”), as amended by the Chandler Act of 1938, Ch. 575, 52 Stat. 840 (1938) ("Chandler Act”), which vested bankruptcy power in the federal district courts and authorized district judges to appoint “referees” in bankruptcy, 1898 Act § 34(1), to refer cases and matters arising under the Bankruptcy Act to them, 1898 Act, § 22, and to review the referees’ orders and reports, 1898 Act § 38; Chandler Act § 39c. See generally 2 Collier on Bankruptcy § 23.04 (14th ed.1984). Bankruptcy Rule 901(7) (1973) (codified at 11 U.S.C. app. Rule 901(7) (1982)) changed the referees’ title to "bankruptcy judges” in 1973.

.Here, in rem jurisdiction was provided by 28 U.S.C. § 1334(e), which grants bankruptcy courts in rem jurisdiction over the property of the bankruptcy estate wherever that property may be located, see Tultex Corp. v. Freeze Kids, LLC, 252 B.R. 32, 40 (S.D.N.Y.2000), so territorial jurisdiction over the vessels in foreign ports presents no problem if subject matter jurisdiction exists.

. As Professor Landers cogently observed: “The only way to obtain a precise holding on the point would be for a maritime lienor ... to await the nonadmiralty sale [by the bankruptcy court] and then sue to enforce his lien on the ground that the sale did not execute the lien.” Landers, supra, at 507 n. 475; see Gilmore & Black, § 9-95, at 816-17.